## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   CHUCK McCUNE and                                   No. 20-12326-j7
         CHUTHAMARD McCUNE,

         Debtors.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on *Creditor's Motion to Determine That Debtors' Real Estate Contract on Their Residence Has Been Rejected and That No Real Estate Is Part of the Bankruptcy Estate* (the "REC Rejection Motion" – Doc. 257), filed by Robert Pidcock, as Personal Representative of the Estate of Thomas W. Kuehn (the "Personal Representative"). Debtor Chuck McCune filed an objection to the REC Rejection Motion (the "Objection" – Doc. 272), and the Personal Representative filed a reply (Doc. 275). The Court held a final evidentiary hearing on the REC Rejection Motion on November 3 and 8, 2023 (the "Final Hearing"). The Personal Representative and Mr. McCune both appeared at the Final Hearing.

The REC Rejection Motion relates to a real estate contract dated October 4, 2007 (the "REC" – Ex. 1), under which Mr. McCune and his wife, co-debtor Chuthamard McCune, are the purchasers of three parcels of real estate. For the reasons explained below, the Court holds that the REC is still in effect and is property of the estate.[1]

---

[1] In this Memorandum Opinion, the "Bankruptcy Code" refers to title 11 of the United States Code. References to "section" and "§" are to sections of the Bankruptcy Code.

# FINDINGS OF FACT[2,3]

The Court FINDS:[4]

(A)    *Transfers to the Sister-in-Law and Mortgage Loan*

In early 2007, Mr. and Mrs. McCune owned three parcels of real estate: a parcel on which the house where they reside is situated (the "Property with the House") and two adjacent or nearby parcels (the "Additional Property"). The Property with the House and the Additional Property shall together be referred to as the "Property."[5] At some point in 2007, the McCunes

---

[2] With the consent of the parties, on the first day of the Final Hearing on November 3, 2023, the Court took judicial notice of the docket and the documents on the docket in this bankruptcy case. Doc. 315. The Court also hereby takes judicial notice of the claims register in this bankruptcy case and the claims filed on the claims register, as well as the docket and the documents on the docket in a related adversary proceeding, Adv. Proc. No. 21-1013-j. *See* Fed. R. Evid. 201(b)(2) and (c); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its own docket), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("[T]he bankruptcy court appropriately took judicial notice of its own docket[.]").

[3] Mr. McCune filed three documents following the Final Hearing which he apparently intends to offer as evidence related to the REC Rejection Motion: (1) *Debtor's Advice of REC Payment to Sunwest Escrow, LC as Proof of Valid REC* (Doc. 324), filed on November 13, 2023; (2) *Supplement to Debtor's Advice of REC Payment to Sunwest Escrow as Proof of Valid REC* (Doc. 326), filed on November 14, 2023; and (3) *Second Supplement to Debtor's Advice of REC Payment to Sunwest Escrow, LC as Proof of Valid REC* (Doc. 327), filed on November 21, 2023. The Court denies admission of these documents into evidence because the evidence for the Final Hearing was closed on November 3, 2023.

[4] Findings of fact made in the Discussion section of this Opinion are incorporated herein.

[5] The Property with the House is:

> Lot Thirty-Three (33), of the Teague Addition, A Subdivision within Section 35, Township 10 North, Range 2 East, N.M.P.M. Bernalillo County New Mexico, as the same is shown and designated on the plat of said subdivision filed in the office of the County Clerk of Bernalillo County, New Mexico on November 7, 1951.

The Additional Property is:

> (1) Lot Thirty-One (31), of the Teague Addition, A Subdivision within Section 35, Township 10 North, Range 2 East, N.M.P.M. Bernalillo County New Mexico, as the same is shown and designated on the plat of said subdivision filed in the office of the County Clerk of Bernalillo County, New Mexico on November 7, 1951.

> (2) Lot Thirty-Two (32), of the Teague Addition, A Subdivision within Section 35, Township 10 North, Range 2 East, N.M.P.M. Bernalillo County New Mexico, as the same is shown and designated on the plat of said subdivision filed in the office of the County Clerk of Bernalillo County, New Mexico on November 7, 1951.

sold the Property with the House to Kanoken Tungdeeteesud, who is Mrs. McCune's sister and Mr. McCune's sister-in-law (the "Sister-in-Law"). On June 14, 2007, the Sister-in-Law obtained a mortgage loan secured by the Property with the House (the "Mortgage Loan").[6] The Mortgage Loan was made in the principal amount of $189,000, plus interest at a rate of 6.5% per year. Taylor, Bean & Whitaker Mortgage Corp. ("Taylor Bean") was the original mortgage lender (together with all subsequent owners and/or servicers of the Mortgage Loan, the "Mortgage Lender"). The original Mortgage Loan had a term of 30 years, with the first payment due August 1, 2007. Ex. 3 at ¶ 3. The Personal Representative asserted but did not establish that the McCunes sold the Property with the House to the Sister-in-Law for $210,000 with a down payment of $21,000.

Subsequent to the Sister-in-Law's purchase of the Property with the House and procurement of the Mortgage Loan, the McCunes on July 17, 2007 executed quit claim deeds transferring the Additional Property to the Sister-in-Law.[7] Mr. McCune testified that the Mortgage Loan should have been secured by the Additional Property in addition to the Property with the House, and the fact that the Mortgage Loan was only secured by the Property with the House was an oversight by the original Mortgage Lender; however, there is insufficient evidence to establish this.[8]

---

[6] *See* Ex. 3 (the promissory note) and Ex. 4 (the recorded mortgage/deed of trust).

[7] The quit claim deeds are not dated, but they were notarized on July 17, 2007 and recorded with the Bernalillo County clerk's office on October 5, 2007. The notarization date is the best evidence of the date the quit claim deeds were executed. Ex. R at pp. 11-12.

[8] The parties dispute whether the Property with the House alone or all Property together constitutes the McCunes' homestead. The issue is not relevant to a ruling on the REC Rejection Motion. It goes to the Personal Representative's objection to the McCunes' amended claim of homestead exemption and Mr. McCune's motion to avoid judicial lien. The contested matters involving the claim of exemption and lien avoidance motion are currently stayed. *See* Doc. 281.

(B)  *The Real Estate Contract*

On October 4, 2007, the Sister-in-Law, as Seller, and the McCunes, as Purchaser, entered into the REC, under which the McCunes were purchasing the Property back from the Sister-in-Law. The purchase price under the REC was $210,000, with $21,000 due as a down payment and the remaining $189,000 due in monthly installments. REC at ¶ 2. The unpaid principal balance under the REC accrues interest at 6.5% per year.[9] The REC also provides that the McCunes shall pay each month a pro-rated portion of the estimated annual property taxes and insurance premiums for the Property. Payments under the REC are due on the first of each month, with the first payment due October 1, 2007.

Under the REC, Sunwest Trust, Inc. ("Sunwest Escrow") is appointed as escrow agent. Pursuant to the REC, the following papers were placed in escrow: (1) signed copy of the REC, (2) original warranty deed signed by the Sister-in-Law conveying the Property to the McCunes, and (3) original special warranty deed signed by the McCunes conveying the Property to the Sister-in-Law. REC at ¶ 9.

As written, the REC provides that the McCunes do not assume or agree to pay the Sister-in-Law's Mortgage Loan, and that Sunwest Escrow shall forward the payments due under the Mortgage Loan to the Mortgage Lender from funds the McCunes pay to Sunwest Escrow. The REC provides:

> The following lien(s) or obligation(s) is currently outstanding on the property:
>> TYPE OF LIEN OR OBLIGATION HOLDER
>> that certain Mortgage with Taylor Bean & Whitaker Mortgage Corp.
>
> Purchaser does not assume or agree to pay the above described lien(s) or obligation(s). All payments due on such lien(s) or obligation(s) shall be remitted by the Escrow Agent to the person or company to whom they are payable out of the payments made by Purchaser. . . . Upon payment in full of this Contract,

---

[9] The interest on unpaid principal balance began accruing September 1, 2007. REC at ¶ 2.

Seller shall obtain a release of the property from the lien(s) or obligation obtained above.

REC at ¶ 2. The REC further provides that Sunwest Escrow shall forward the amounts the McCunes paid in escrow for taxes and insurance to the Mortgage Lender. REC at ¶ 2. Under the REC, the McCunes are entitled to possession and use of the Property during the performance of the contract.[10] The house in which the McCunes currently live is situated on the Property with the House.[11]

The REC provides that upon default of the McCunes' payment obligations, "the Seller may make written demand upon the Purchaser, with such notice to specify the default and the curative action required[.]" REC at ¶ 5(a). If the McCunes do not cure any default within 30 days after the Sister-in-Law's default notice is mailed, the Sister-in-Law may, at her option, either accelerate the entire unpaid balance under the REC or terminate the contract. REC at ¶ 5(c). Further, "[a]cceptance by Escrow Agent of any payment tendered shall not be deemed a waiver by Seller, or extension of the time for cure, of any other default" under the REC. *Id.* If the Sister-in-Law elects to terminate the REC, a recordable affidavit made by her with certain information—including that "the specified default has not been cured within the time allowed and that the Seller has elected to terminate"—and delivered to the escrow agent "shall be conclusive proof for the Escrow Agent and any subsequent Purchaser or encumbrancer for value of such uncured default and election of termination." REC at ¶ 5(d).

---

[10] The REC provides: "Purchaser shall be entitled to take possession of the Property and retain possession unless and until Purchaser's interests under this Contract shall be terminated by Seller as provided in Paragraph 5 below." REC at ¶ 4.

[11] Again, the Court is not making any determination at this time as to whether the McCunes' homestead includes the Additional Property.

Upon full payment of all amounts due and owing to the Sister-in-Law under the REC by the McCunes, Sunwest Escrow is directed by the REC to release and deliver the original warranty deed and the original special warranty deed to the McCunes. REC at ¶ 9(c). In contrast, upon termination of the REC following an uncured default, Sunwest Escrow is directed to release and deliver the original warranty deed and the original special warranty deed to the Sister-in-Law. REC at ¶ 9(d).[12]

The REC has a provision requiring that any modifications be made in writing. It states, "This Contract can be modified only in writing signed by the parties hereto." REC at p. 4. No written modifications to the REC have been made.

(C)    *Comparison of Amounts Due Under the REC and the Mortgage Loan*

Both the REC and the Sister-in-Law's Mortgage Loan provide for financing in the principal amount of $189,000, which accrues interest at the rate of 6.5% per year. *See* REC at ¶ 2; Ex. 3 at ¶¶ 1-2. Both the REC and the Mortgage Loan further provide for payment of taxes and insurance, although they are stated slightly differently. The REC provides that the McCunes shall pay "with each installment, a pro rata portion of the estimated annual taxes and insurance premiums for hazard insurance on [the] Property." REC at ¶ 2. Similarly, the Mortgage Loan requires that the Sister-in-Law pay, along with her monthly payment of principal and interest, certain escrow items. Ex. 4 at ¶ 3. The applicable escrow items appear to be amounts due for

---

[12] The REC provides, "If the Seller or his agent delivers an Affidavit of Uncured Default and Election of Termination and Election of Termination (as described in Paragraph 5 above) to the Escrow Agent, then the Escrow Agent shall release and deliver the escrow documents to the Seller. The Escrow Agent shall be entitled to rely on such Affidavit as conclusive proof of termination." REC at ¶ 9(d).

taxes and assessments and insurance premiums for hazard insurance. *Id.*[13]

Despite the similarities between the required payments under the REC and the Mortgage Loan, and both agreements providing for a principal amount of $189,000 and interest on the unpaid principal balance of 6.5% per year, the monthly payment amounts for principal and interest are different under the REC and the Mortgage Loan. The Mortgage Loan provides for monthly installments of principal and interest in the amount of $1,194.61, and the REC provides for monthly installments of principal and interest in the amount of $1,339.13.

The first payment under the Mortgage Loan was due two months earlier than the first payment under the REC (August 1, 2007 versus October 1, 2007), but this does not account for the difference in monthly payment amounts. At the higher monthly payment amount, the term of the REC as written would be several years shorter than the term of the original Mortgage Loan.

(D)   *Payments to Sunwest Escrow*

After entering into the REC with the Sister-in-Law in October 2007, the McCunes initially made their payments to Sunwest Escrow as set forth in the REC. The McCunes made ten monthly payments to Sunwest Escrow, beginning October 2007 through July 2008. Ex. 2. Subsequently, the McCunes began paying the Mortgage Lender directly.

---

[13] The Mortgage Loan requires payment of "a sum . . . to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the [Property with the House]; (b) leasehold payments or ground rents on the [Property with the House], if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10." Ex. 4 at ¶ 3. There are no known leasehold payments, ground rents, or mortgage insurance premiums required, and "Section 5" requires hazard insurance: "Borrower shall keep the improvements now existing or hereafter erected on the [Property with the House] insured against loss by fire, hazards included within the term 'extended coverage,' and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance." Ex. 4 at ¶ 5.

The payments forwarded by Sunwest Escrow to the Mortgage Lender were not received timely, which led to late fees under the Mortgage Loan, and the McCunes began paying the Mortgage Lender directly in order to avoid such late fees. The REC inadvertently created the timing problem because payments under the REC were due on the same day as payments under the Mortgage Loan, so there was insufficient time for payments to be forwarded by Sunwest Escrow to the Mortgage Lender and be received timely. The Court infers that the McCunes paid at least the full monthly payments due under the Mortgage Loan when they began paying the Mortgage Loan directly.

(E)   *Payments to Nationstar dba Mr. Cooper*

At some point, Nationstar Mortgage LLC dba Mr. Cooper ("Mr. Cooper") became the Mortgage Lender. Comparing the Mr. Cooper payment history for the Mortgage Loan with the McCunes' bank statements, it is clear that all payments made on the Sister-in-Law's Mortgage Loan from April 2021 through August 2023 were made by the McCunes. The McCunes' bank statements show that the McCunes' made those payments to Mr. Cooper in the form of electronic withdrawals from the McCunes' Nusenda Credit Union ("Nusenda") account ending -4980, as follows:

**2021**

| Date | Amount | Recipient |
|------|--------|-----------|
| 4/2/21 | 1,323.45 | Nationstar dba Mr. Cooper 210402 |
| 4/29/21 | 1,323.45 | Nationstar dba Mr. Cooper 210429 |
| 6/1/21 | 1,323.45 | Nationstar dba Mr. Cooper 210529 |
| 6/21/21 | 303.09 | Nationstar dba Mr. Cooper 210619 |
| 6/29/21 | 1,316.48 | Nationstar dba Mr. Cooper 210629 |
| 7/12/21 | 1,316.48 | Nationstar dba Mr. Cooper 210710 |
| 8/31/21 | 1,316.48 | Nationstar dba Mr. Cooper 210831 |
| 9/20/21 | 1,316.48 | Nationstar dba Mr. Cooper 210918 |
| 10/21/21 | 1,316.48 | Nationstar dba Mr. Cooper 211021 |
| 12/10/21 | 1,366.48* | Nationstar dba Mr. Cooper 211210 |

**2022**

| Date | Amount | Recipient |
|------|--------|-----------|
| 1/3/22 | 1,316.48 | Nationstar dba Mr. Cooper 220101 |
| 2/10/22 | 1,316.48 | Nationstar dba Mr. Cooper 220210 |
| 3/10/22 | 1,313.74 | Nationstar dba Mr. Cooper 220310 |
| 4/1/22 | 1,313.74 | Nationstar dba Mr. Cooper 220401 |
| 5/3/22 | 1,313.74 | Nationstar dba Mr. Cooper 220503 |
| 6/9/22 | 1,313.74 | Nationstar dba Mr. Cooper 220609 |
| 7/1/22 | 1,313.74 | Nationstar dba Mr. Cooper 220701 |
| 8/1/22 | 1,313.74 | Nationstar dba Mr. Cooper 220730 |
| 9/7/22 | 1,313.74 | Nationstar dba Mr. Cooper 220907 |
| 10/3/22 | 1,313.74 | Nationstar dba Mr. Cooper 221001 |
| 11/10/22 | 1,313.74 | Nationstar dba Mr. Cooper 221110 |
| 12/5/22 | 1,313.74 | NSM DBAMR.COOPER 221203 |

**2023**

| Date | Amount | Recipient |
|------|--------|-----------|
| 1/3/23 | 1,313.74 | NSM DBAMR.COOPER 221231 |
| 2/3/23 | 1,445.84* | NSM DBAMR.COOPER 230202 |
| 3/2/23 | 1,296.03 | NSM DBAMR.COOPER 230301 |
| 4/3/23 | 1,296.03 | NSM DBAMR.COOPER 230401 |
| 5/8/23 | 1,296.03 | NSM DBAMR.COOPER 230505 |
| 6/2/23 | 1,296.03 | NSM DBAMR.COOPER 230601 |
| 7/10/23 | 1,296.03 | NSM DBAMR.COOPER 230709 |
| 8/3/23 | 1,296.03 | NSM DBAMR.COOPER 230802 |

*See* Ex. A. All payments on the Mortgage Loan from April 2021 through August 2023 were made by the McCunes, with the exception of a *de minimis* interest payment on June 17, 2021 in the amount of $4.27.[14] The Mr. Cooper payment history for the Mortgage Loan tracks the

---

[14] This also excludes two other "posted payments" on the Mr. Cooper payment history on 6/17/21: (1) a "lender paid expense" in the amount of $165.00 and (2) an "escrow adjustment" in the amount of $5,364.93. Neither appears to be a payment made by the Sister-in-Law or another outside party. The Court notes that there are four entries in the "Other" column of ($1,449.64) each. The evidence does not show the significance of those entries. The entries are not material for purposes of the conclusions the Court reaches.

electronic withdrawals from the McCunes' account.[15,16]

(F)  *Other Payments to the Mortgage Lender*

For payments made to the Mortgage Lender prior to April 2021, there are three sources of direct documentary evidence: (1) the Mr. Cooper payment history showing payments dating back to March 2015, (2) a summary chart prepared by Mr. McCune showing payments dating back to April 2014, and (3) a random sampling of the McCunes' bank statements.

Mr. McCune's summary chart is Exhibit A at pages 60-62 (the "Summary Chart"). The Summary Chart reflects payments made by the McCunes from their Nusenda account to Mr. Cooper. It also reflects payments made by the McCunes from their Bank of America account, which is now closed, to Mr. Cooper and to the previous Mortgage Lender (Cenlar). The Summary Chart is supported by the Nusenda bank statements summarized in Part E above, as well as a random sampling of the Bank of America statements ordered by the Court.[17] The Court

---

[15] The Mr. Cooper payment history for the Mortgage Loan shows that payments were made in the same amounts 1 to 4 days before each of the electronic withdrawals reflected on the McCunes' bank statement. Presumably the payments were authorized with Mr. Cooper on the dates on the payment history and then it took up to a few days for Mr. Cooper to make the debit request with Nusenda Credit Union and/or for the payment to be processed.

[16] Regarding the payments marked with a * in the chart above, the 12/10/21 electronic withdrawal of $1,366.48 from the McCune's bank account is reflected on the Mr. Cooper payment history as two payments in the amounts of $1,316.48 (the monthly payment) and $50.00 (fees), which together total $1,366.48. The 2/3/23 electronic withdrawal of $1,445.84 from the McCune's bank account is reflected on the Mr. Cooper payment history as two payments in the amounts of $1,313.74 (the monthly payment) and $132.10 (escrow deposit).

[17] At a status conference on discovery issues in this contested matter held September 15, 2023, Mr. McCune represented that the Summary Chart is based on information that was imported into his Quicken account, and to the extent it reflects payments made from the Bank of America account, the information was imported into Quicken at a time when the Bank of America account was still open. *See* Doc. 288. Mr. McCune further represented that it would be burdensome to search for and redact all his bank statements going back to 2007. In an order resulting from the status conference (Doc. 289), the Court ordered Mr. McCune to produce a random sampling, chosen by the Court, of the Bank of America bank statements on which the Summary Chart is based. Such random sampling was admitted as part of Exhibit B (pp. 1-5). Because the random sampling of bank statements matches the Summary Chart, it establishes a high likelihood that the Summary Chart is accurate with respect to the Bank of America payments.

took under advisement whether to admit the Summary Chart into evidence. In light of the

supporting documentation, the Court admits the Summary Chart into evidence.[18]

The Summary Chart supports the proposition that payments on the Mortgage Loan made

to Mr. Cooper from March 2015 through March 2021 were made by the McCunes. Almost all of

the payments reflected on the Mr. Cooper payment history are also reflected in the Summary

Chart as being made from the McCunes' bank account.[19],[20]

The Summary Chart also shows eleven payments for the prior year (April 2014-March

2015) made by the McCunes to "Cenlar/Central Loan Adm." Cenlar was the Mortgage Lender

prior to Mr. Cooper, and the Personal Representative stated that he served a subpoena on Cenlar

but was unable to obtain documents from Cenlar.

In addition to the random sampling of bank statements for the time period covered by the

Summary Chart, there is also a random sampling of the McCunes' bank statements for years

2007-2013 ordered by the Court.[21] The first two bank statements show payments to Sunwest

---

[18] Even if the Court did not admit the Summary Chart into evidence, the Court's ultimate fact findings would not change.

[19] The exceptions are payments made on (1) 12/2/2015, (2) 5/9/2016, (3) 6/8/2016, (4) 7/8/2016, (5) 4/16/2017, (6) 5/3/2019, and (7) 6/17/2021. If the McCunes made these payments to Mr. Cooper, it is not reflected on the Summary Chart.

[20] The random sampling of bank statements also directly supports that the McCunes were the source of the payments to Mr. Cooper on the Mortgage Loan reflected in the Mr. Cooper payment history. *Compare* Ex. B *with* Ex. 5. The Court notes that in May 2019, the McCunes' bank statement reflects a payment of $1,350.43 to Nationstar dba Mr. Cooper; the amount matches the Mr. Cooper payment history after "unapplied funds" of $99.21 are subtracted from the monthly payment of $1,449.64, resulting in $1,350.43. In July 2018, the McCunes' bank statement reflects a payment of $1,470.15, and the Mr. Cooper payment history reflects a monthly payment of $1,451.15 plus fees of $19, totaling $1,470.15. In February 2017, both the McCunes' bank statement and the Mr. Cooper payment history show a payment of $1,454.06. In March 2016, the McCunes' bank statement reflects a payment of $1,544.40, and the Mr. Cooper payment history reflects a monthly payment of $1,530.40 plus fees of $14, totaling $1,544.40.

[21] Mr. McCune provided a list of the bank statements he was able to find for 2007-2013, *see* Doc. 292, and the Court ordered Mr. McCune to produce another random sampling of such bank statements, *see* Doc. 306. All of the bank statements comprising such random sampling were admitted as part of Exhibit B, with one exception which was not included in the exhibit (the bank statement for the period beginning September 24, 2013).

Escrow (on 10-9-2007 and 5-7-2008), and the other four show payments to "Central Loan Adm.," *i.e.*, Cenlar.

There is one additional bank statement record from this time period, Exhibit R at p. 20, which is a page from the McCunes' Bank of America bank statement for the period 10-25-08 through 11-20-08. The page shows that the McCunes made a payment to "Taylorbean" on 11-10-08. The Court took under advisement whether to admit this page. The Court admits page 20 of Exhibit R on the same basis it admitted the bank statement records in Exhibit B—to show that the McCunes made a payment in the amount listed, to the institution listed, on the date listed. The Court notes that Taylor Bean was the original Mortgage Lender. Page 20 of Exhibit R is therefore consistent with the fact that the McCunes began paying the Mortgage Lender directly after they ceased paying Sunwest Escrow.[22]

In light of the direct documentary evidence set forth above in this section, as well as (1) the documentary evidence showing that the McCunes made payments to Sunwest Escrow from October 2007 through July 2008 and to Mr. Cooper from April 2021 through August 2023 and (2) Mr. McCune's testimony that the McCunes began paying the Mortgage Lender directly instead of Sunwest Escrow and have not defaulted under the REC, the Court infers and therefore finds that the McCunes generally paid the Mortgage Lender directly after July 2008 through August 2023. Even without admission of the Summary Chart and Ex. R, the Court has sufficient evidence to make such inference.

This inference does not include a finding that payments were made every month on the Mortgage Loan; in fact, the Mr. Cooper payment history shows that at least some payments were

---

[22] Even if the Court did not admit Page 20 of Exhibit R into evidence, the Court's ultimate fact findings would not change.

missed. However, Mr. Cooper accepted payments through August 2023, and the Mortgage Loan therefore appears to be in good standing as of such time.

      (G)   *Mortgage Loan Modification*

The Mr. Cooper payment history shows that no payments were made on the Mortgage Loan from February 2020 through March 2021. As of February 2021, an amount of $24,999.94 was due and payable on the Mortgage Loan. Mr. McCune testified that Mr. Cooper gave the Sister-in-Law a forbearance due to the Covid-19 pandemic and that the Sister-in-Law in turn provided a forbearance to the McCunes under the REC. No written forbearance for either the Mortgage Loan nor the REC was provided.

The Sister-in-Law and Mr. Cooper entered into a loan modification agreement effective August 1, 2021 (the "Loan Modification" – Ex. 8), which provides that the unpaid principal balance under the Mortgage Loan, as modified, is $173,093.98. It appears that the amount outstanding under the Mortgage Loan was added to the principal balance. The Loan Modification provides that the unpaid principal balance accrues interest at the same 6.5% per year, and the new maturity date is July 1, 2061. The Loan Modification is consistent with Mr. McCune's testimony that Mr. Cooper gave the Sister-in-Law a forbearance due to the Covid-19 pandemic and that the Sister-in-Law in turn provided a forbearance to the McCunes under the REC. The Court so finds.

      (H)   *Post-Petition Payments and No Evidence of REC Default Notice*

The McCunes filed a voluntary chapter 13 petition commencing this bankruptcy case on December 29, 2020. The payments that the McCunes made to Mr. Cooper from April 2021 through August 2023 therefore were made post-petition, *i.e.*, after the McCunes' bankruptcy filing. This bankruptcy case was converted from a case under chapter 13 to a case under

chapter 7 on October 28, 2021. *See* Doc. 101. Sixty (60) days following the conversion was December 27, 2021. The payments the McCunes made to Mr. Cooper from January 2022 through August 2023 were therefore made more than 60 days following the conversion of this bankruptcy case to a case under chapter 7.

The Sister-in-Law received notice of the filing of this bankruptcy case under chapter 13, *see* Doc. 9, and notice of the conversion of this bankruptcy case to a case under chapter 7, *see* Docs. 106 & 107. No evidence was provided that the Sister-in-Law sent a notice of default under the REC pursuant to ¶ 5(a) of the REC at any point, and the Court finds that no notice of default was given.

    (I)    *The Personal Representative's Judgment Lien*

The Personal Representative filed a proof of claim (Claim 2) in this bankruptcy case on account of a judgment he obtained against the McCunes in New Mexico state court (the "Judgment").[23] This Court previously determined that the Judgment has claim preclusive effect as to the validity and amount of the debt owed by the McCunes to the Personal Representative. *See* Docs. 204 & 205 in Adv. Proc. No. 21-1013-j. The Personal Representative asserts that he has a judgment lien against the Property, due to a transcript of judgment relating to the Judgment recorded in Bernalillo County. *See* Claim 2-1 at Ex. 3. Mr. McCune has filed a motion to avoid the Personal Representative's judgment lien. Doc. 234.

---

[23] Case No. D-202-CV-2019-03218 in the Second Judicial District Court for the State of New Mexico.

DISCUSSION

The ultimate issue before the Court is whether the McCunes' interest in the Property arising from their interest in the REC is property of the bankruptcy estate.

The Personal Representative argues that neither the McCunes nor the bankruptcy estate has any interest in the Property or the REC. The Personal Representative reasons that (i) the estate's and the McCunes' interest in the Property arises from their interest in the REC, (ii) the REC is an executory contract governed by § 365(d), (iii) the REC was rejected by operation of § 365(d)(1) because it was not assumed within 60 days of the date of the chapter 7 order for relief, (iv) the REC automatically terminated upon its rejection, and (v) the termination of the REC extinguished any interest the estate or McCunes had in the Property. The Personal Representative argues further that even if rejection of the REC constituted a material breach that did not automatically terminate the REC, the Sister-in-Law did not waive the breach by accepting post-rejection payments under the REC because the McCunes' payments to the Mortgage Lender are not payments under the REC. The Personal Representative concludes, based on these arguments, that he is free to enforce his judgment lien against the Property free of any bankruptcy restrictions.

Mr. McCune counters that the REC was not rejected pursuant § 365(d)(1) because the REC is a mortgage and, alternatively, the section does not appropriately address the McCunes' equitable interest in the Property. He argues that the Chapter 7 Trustee's failure to assume or reject does not waive any rights of the parties under the REC. Mr. McCune further argues that the Chapter 7 Trustee cannot extinguish the McCunes' equitable interest under the REC and thereby eliminate the McCunes' right to a homestead exemption as well as their right to seek avoidance of the Personal Representative's judicial lien.

1.   *The Court need not decide whether the REC is
     an executory contract governed by § 365.*

Caselaw is divided on whether a real estate contract is an executory contract governed by

§ 365. The Tenth Circuit has adopted the Countryman definition of "executory contracts." *Olah*

*v. Baird (In re Baird)*, 567 F.3d 1207, 1211 (10th Cir. 2009).[24] Under that definition, a contract is

executory if the obligations of both parties are so far unperformed that a failure by either to

complete performance would constitute a material breach excusing performance by the other. *Id.*

at 1210. Professor Countryman developed this definition of executory contracts in 1973 and it

has been widely applied.[25]

In 1985, the United States District Court for the District of New Mexico, in *Shaw v.*

*Dawson*, held that a real estate contract[26] is an executory contract governed by § 365. *Shaw v.*

*Dawson (In re Shaw)*, 48 B.R. 857, 860 (D.N.M. 1985). The *Shaw v. Dawson* court explained:

> A New Mexico real estate contract, of the kind at issue in this case, appears to fall
> squarely within the Countryman definition of an executory contract, within the
> definition contemplated by Congress. The obligation of the buyer to pay the
> purchase price according to the terms of the contract, and the obligation of the
> seller to deliver title to the buyer when full payment has been made, are both
> unperformed. Failure of either party to complete performance would constitute a
> material breach of the contract.

*Id.* The bankruptcy court for the District of New Mexico has followed *Shaw v. Dawson* and

treated real estate contracts as executory contracts.[27] Other courts have also taken this position.[28]

---

[24] However, the Tenth Circuit did not exclude the possibility that there are exceptions to application of the Countryman definition, such as when the contract at issue operates as a financing device.

[25] Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973).

[26] In other states, what is known in New Mexico as a real estate contract is sometimes called a contract for deed or an installment land sale contract.

[27] *In re Gonzales*, No. 21-11384, 2022 WL 17490527, at *8 (Bankr. D.N.M. Dec. 7, 2022) (citing cases where the New Mexico bankruptcy court followed *Shaw v. Dawson* but noting that *Shaw v. Dawson* is not binding precedent).

[28] *See, e.g., Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469, 471-73 (6th Cir. 1989) (land sale contract is executory within the meaning of § 365).

In contrast, there is a line of cases holding that a real estate contract is not an executory contract governed by § 365.[29] The Ninth Circuit Bankruptcy Appellate Panel, in holding that a real estate contract is not an executory contract, explained:

> Contracts for Deeds are merely a financing arrangement for a sale which has already occurred. The vendor retains legal title only as security for the price. Since the deed was placed in escrow prior to the commencement of bankruptcy proceedings, the Debtor had fully performed. As a practical matter, the vendor performs no duties after the execution and deposit of title documents with the escrow agent. The vendor cannot terminate the agreement and recover possession of the property unless there is a material breach by the buyer. Unless a contract is executory on both sides, it cannot be an executory contract.[30]

Acknowledging the split in the caselaw, the Court need not decide for purposes of ruling on the REC Rejection Motion whether the REC is an executory contract governed by § 365. Such a ruling would not affect the result the Court reaches – that the REC is still in effect and is property of the bankruptcy estate.

    2.    *Regardless of whether the REC is an executory contract governed by § 365, the REC is still in effect.*

        (a)    *If the REC is not an executory contract governed by § 365, the REC is still in effect.*

If the REC is not an executory contract governed by § 365, it is clear that the REC has not terminated. The REC provides that if there is an uncured default under the REC, the Sister-in-Law may, at her option, either accelerate the entire unpaid balance under the REC or

---

[29] *See, e.g., Kane v. Harpswell (In re Kane)*, 248 B.R. 216, 223-24 (1st Cir. BAP 2000), *aff'd*, 254 F.3d 325 (1st Cir. 2001) (an installment land sales contract is not an executory contract "if under applicable state law and the particular transaction, the contract is in essence a sale and financing device"); *In re Adolphsen,* 38 B.R. 776, 778 (Bankr. D. Minn. 1983); *In re Cox,* 28 B.R. 588, 591 (Bankr. D. Idaho 1983); *In re Booth,* 19 B.R. 53, 64 (Bankr. D. Utah 1982).

[30] *Horton v. Rehbein (In re Rehbein)*, 60 B.R. 436, 440-41 (9th Cir. BAP 1986) (internal citations omitted); *but cf. Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358, 1365 (9th Cir. 1992) (distinguishing *Rehbein* and holding that land sale contract was executory where vendor retained the deed rather than placing it in escrow and had other material obligations, such as repaying underlying debts on the property and paying insurance premiums, taxes, and assessments).

-17-

terminate the contract. The Sister-in-Law has done neither. Therefore, in accordance with the terms of the REC, the REC has not terminated and is still in effect.

> (b) *Alternatively, if the REC is an executory contract governed by § 365, the REC is still in effect.*

Likewise, if the REC is an executory contract governed by § 365, the REC is still in effect. Although the REC, if governed by § 365, has been rejected by operation of law, the REC has not terminated.

> (i) *If governed by § 365, the REC has been rejected by operation of law.*

If the REC is an executory contract governed by § 365, the REC was automatically rejected by operation of § 365(d)(1). Section 365(d)(1) provides that in a case pending under chapter 7, an executory contract is automatically rejected 60 days after the order for relief, if the executory contract has not been accepted or rejected:

> In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

Under § 348(a), conversion of a case from one chapter of the Bankruptcy Code to another chapter "constitutes an order for relief under the chapter to which the case is converted[.]" The McCunes' case was converted to a case under chapter 7 on October 28, 2021. Sixty days after the order for relief under the McCunes' chapter 7 case was December 27, 2021, and the Chapter 7 Trustee did not assume or reject the REC by December 27, 2021. Therefore, if the REC is governed by § 365, the REC was deemed rejected on the next day pursuant to § 365(d)(1).[31]

---

[31] Even if subject to § 365, the REC was not rejected (automatically or otherwise) while this case was pending under chapter 13. Section 365(d)(2) permits assumption or rejection at any time before confirmation of a plan. No plan was confirmed in the chapter 13 case.

Mr. McCune argues that the Chapter 7 Trustee could not have assumed or rejected the REC because it was being performed. However, the automatic rejection under § 365(d)(1) of an executory contract that has not been assumed or affirmatively rejected is not dependent on whether the contract is being performed. Mr. McCune argues further that there was excusable neglect for why the McCunes did not file a motion to assume the REC within 60 days. However, excusable neglect on the part of Mr. McCune is irrelevant because chapter 7 debtors do not have the statutory authority to file a motion to assume or reject an executory contract that is property of the estate. Section 365(d)(1) provides that the chapter 7 trustee may assume or reject such a contract. Mr. McCune is not the chapter 7 trustee.

(ii) *Rejection of an executory contract governed by § 365 constitutes a material breach that does not necessarily result in termination.*

Having determined that the REC, if governed by § 365, was rejected by operation of § 365(d)(1), the next issue is whether the rejection terminated the REC. The Personal Representative argues that the effect of rejection is termination of the REC. He asserts that the circuits are split on whether rejection of an executory contract constitutes a material breach or termination, but this is incorrect. Rejection is not synonymous with termination.

With exceptions not applicable here, § 365(g) provides that "rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease[.]" The United States Supreme Court in *Mission Product Holdings, Inc. v. Tempnology, LLC* held that rejection is a breach with the same consequence as a contract breach outside of bankruptcy—and does not by itself terminate the contract. 587 U.S. ----, 139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019); *accord In re Blair*, 534 B.R. 787, 790 (Bankr. D.N.M. 2015) (holding that rejection of a residential real property lease constitutes a breach but "the rejection itself does not terminate the lease").

As the Supreme Court explained, "'[B]reach' [as used in § 365(g)] is neither a defined nor a specialized bankruptcy term. It means in the Code what it means in contract law outside bankruptcy." *Mission Prod.*, 139 S. Ct. at 1661. When a contract is materially breached, the injured party generally has the choice to "keep up its side of the bargain . . . while suing . . . for damages from the . . . breach" or it can "call the whole deal off, halting its own [performance], while suing for any damages incurred." *Id*. at 1662. Thus:

> A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive.

*Id.* This view of rejection is further bolstered by the fact that, "[i]f trustees (or debtors) could use rejection to rescind previously granted interests, then rejection would become functionally equivalent to avoidance." *Id.* at 1663.

Pursuant to § 365(g)(1), the rejection of the REC, if it is governed by § 365, would be a "breach of such contract . . . immediately before the date of the filing of the petition," in this case December 29, 2020.[32]

> (iii) *A material breach giving rise to a right to terminate a rejected executory contract can be waived.*

Having determined that, if the REC is governed by § 365, the REC was rejected and that the rejection constitutes a material breach of the REC, the Court next considers whether a material breach from automatic rejection may be waived. The REC is governed by New Mexico

---

[32] Generally, rejection is a material breach. There are limited circumstances where rejection may only be a technical breach that does not give rise to the right to terminate, but such circumstances are not present here. *See Blair*, 534 B.R. at 790-91 (holding that rejection of lease is technical breach where debtor executes a knowing, voluntary, and court-approved waiver of the discharge of any obligations under the lease).

law.[33] If the rejection breach is waived, there is no longer any right to terminate the contract on account of the rejection. "Waiver is defined as 'the intentional relinquishment or abandonment of a known right,' and it may be express or implied." *Gonzales v. Liberman (In re Brutsche)*, No. 11-1189, 2012 WL 5457324, at *5 (Bankr. D.N.M. Nov. 8, 2012) (quoting *J.R. Hale Contracting Co. v. United N.M. Bank,* 1990-NMSC-089, ¶ 11, 110 N.M. 712, 716, 799 P.2d 581, 585). "A waiver must be knowing and voluntary." *Brutsche*, 2012 WL 5457324, at *5 (quoting *State v. Zamarripa*, 2009-NMSC-001, ¶ 38, 145 N.M. 402, 410, 199 P.3d 846, 854).

Consistent with the holdings of many courts, this Court holds that a breach of executory contract arising from rejection of the contract under § 365 is waivable. The "counter-party to an executory contract can waive the automatic rejection under section 365[] as long as the intention to relinquish or waive a right or advantage is clearly established by the evidence." *In re Lockwood*, No. 05-31424, 2008 WL 943025, at *3 (Bankr. N.D. Cal. Apr. 7, 2008).[34]

A rejection breach may be waived by the counterparty's "continued recognition of [the] contract as binding" after the breach. *In re Sydmark*, No. 06-41218, 2008 WL 2520105, at *12

---

[33] "When a claim sounds in contract, New Mexico will generally apply the choice-of-law rule of *lex loci contractus*—the law of the place of contracting." *Abraham v. WPX Energy Prod., LLC*, 20 F. Supp. 3d 1244, 1265 (D.N.M. 2014). New Mexico is the place of contracting, and the REC does not include a choice-of-law provision selecting the law of another forum; therefore, New Mexico law applies.

[34] The *Lockwood* court includes the following string cite in support of such proposition:

> *In re Southern Motel Assocs., Ltd.,* 81 B.R. 112 (Bankr. M.D. Fla. 1987) (lessor may waive its right to have lease deemed rejected if, through its conduct, it evidences an intention to have lease treated as continuing, but waiver of such right must be clearly established by evidence); *see also Bethesda-Union Soc'y of Savannah, Inc. v. Austin (In re Austin),* 102 B.R. 897, 900-01 (Bankr. S.D. Ga. 1989); *In re T.F.P. Resources, Inc.,* 56 B.R. 112, 115-16 (Bankr. S.D.N.Y. 1985) ("It thus appears that § 365(d)(4) can be waived by a lessor. Like former § 70(b), it was enacted for the benefit of lessors and we also see no reason why that benefit can not be waived, notwithstanding the conclusiveness of the self-executing mechanism of § 365(d)(4)."); *In re VMS Nat. Props.,* 148 B.R. 942, 945 (Bankr. C.D. Cal. 1992).

*Lockwood*, 2008 WL 943025, at *3. *See also Ranch House of Orange-Brevard, Inc. v. Gluckstern (In re Ranch House of Orange-Brevard, Inc.)*, 773 F.2d 1166, 1168-69 (11th Cir. 1985) (holding that equitable doctrines of waiver and estoppel are available following express rejection of lease).

(Bankr. D. Kan. June 20, 2008) (citing *In re Landmark Holding Co.*, 286 B.R. 377, 383 (Bankr. D. Minn. 2002)). Acceptance of payments following the expiration of the 60-day period under § 365(d)(1) may constitute a waiver of the rejection breach. 3 Collier on Bankruptcy ¶ 365.10[3][b] (16th ed. 2024); *see also IDEA Boardwalk, LLC v. Polo N. Country Club, Inc. (In Re Revel AC, Inc.)*, No. 14-1756, 2016 WL 6155903, at *8 (Bankr. D.N.J. Oct. 21, 2016) (holding that lessee waived debtors' rejection breach of the lease and "exercised its right not to terminate the Lease" by remaining in possession and "continu[ing] its relationship under the existing terms and conditions").[35]

### (iv) *The Sister-in-Law waived any rejection breach by accepting payments under the REC.*

In this case, the Sister-in-Law received notice of the filing of the bankruptcy case and notice of the conversion of the case to one under chapter 7. The McCunes continued to make payments under the REC after the date of any deemed rejection for all months at issue—January 2022 through August 2023.[36]

For the reasons discussed below, the Court concludes that the McCunes' payments to the Mortgage Lender constitute payments under the REC and the modification of the REC to so provide need not be writing notwithstanding a provision in the REC to the contrary. Even assuming the REC is subject to § 365, the Sister-in-Law's continued acceptance of such payments following the automatic rejection of the REC pursuant to § 365(d)(1) operates as a waiver of the rejection breach.

---

[35] *See generally Presidential Hospitality, LLC v. Wyndham Hotel Grp., LLC*, No. CV 17-0981, 2018 WL 2604831, at *21 (D.N.M. June 2, 2018) ("Accepting payment notwithstanding a contract breach can be evidence of waiver."); *J.R. Hale*, 1990-NMSC-089, ¶ 21, 110 N.M. at 719, 799 P.2d at 588 ("When a party accepts a late payment on a contract without comment he waives the default that existed.").

[36] Given the timing of the Final Hearing, no information regarding subsequent months is in evidence.

For the McCunes' post-rejection payments to the Mortgage Lender to constitute payments under the REC (and thus lead to waiver of the rejection breach by acceptance of such payments), the REC must have been modified from the original agreement which provided that the McCunes would make payments under the REC to Sunwest Escrow. "New Mexico courts recognize the principle that contracts may be modified by the conduct of the contracting parties." *Health Care Servs. Corp. v. Sw. Trane*, No. CV 09-1213, 2010 WL 11618903, at *5 (D.N.M. Dec. 17, 2010).

The New Mexico Supreme Court has stated, "the conduct of the parties in *performing* an agreement may be relevant to show a modification or waiver of a provision inconsistent with their conduct in the performance of that agreement" (*i.e.*, a contract may be modified through course of performance). *J.R. Hale*, 1990-NMSC-089, ¶ 20, 110 N.M. at 718, 799 P.2d at 587 (emphasis in original). The *J.R. Hale* decision was in the context of the New Mexico Uniform Commercial Code, but the court explained that the principles "are consistent with [New Mexico Supreme Court] cases regarding performance." *Id.* (citing cases); *see also Rogers v. Eddy County Bd. of Comm'rs*, 982 F.2d 529 (Table) (10th Cir. 1992) (unpublished) (providing that under New Mexico law, "when the parties undertake a course of mutual conduct contrary to the written terms of an agreement, that conduct forms a modification of the original contract").[37]

In this case, the McCunes ceased paying Sunwest Escrow in 2008 and began paying the Mortgage Lender directly. The McCunes have generally been paying the Mortgage Lender

---

[37] Modification by conduct requires consideration for the modification. "A contract may be modified by the parties' conduct if the conduct shows that the parties mutually agreed to amend the agreement, and that the modification was supported by consideration." *Quintana v. First Nat'l Bank*, 64 F.3d 670 (Table) (10th Cir. 1995) (unpublished) (citing *J.R. Hale*, 1990-NMSC-089, ¶¶ 13, 22, 110 N.M. at 717, 719, 799 P.2d at 586, 588); *see also Kelly Inn No. 102, Inc. v. Kapnison*, 1992-NMSC-005, ¶ 48, 113 N.M. 231, 245, 824 P.2d 1033, 1047. In this case the consideration for direct payments to the Mortgage Lender includes the reduction of late fees charged to the Sister-in-Law under the Mortgage Loan on account of payments being made late when they passed through Sunwest Escrow.

directly since 2008. No evidence was presented that the Sister-in-Law sent a notice of default on account of the failure to remit payment to Sunwest Escrow. Unless modification of the REC by course of performance is barred by the terms of the REC itself or by the Statute of Frauds, this course of performance of the REC modified the provision in the REC that the McCunes' payments were to be made to Sunwest Escrow.

The Personal Representative argues that the REC cannot be modified by the parties' conduct or course of performance because the REC provides that it cannot be modified other than in writing. However, under New Mexico law, "in the absence of a prohibiting statute, a written agreement which specifies it may only be amended in writing may nevertheless be changed by the parties' words or conduct that signify an intention to change the prior agreement."[38] Such modification must be proven by clear and convincing evidence.[39] The McCunes have satisfied that burden of proof. The parties by their course of performance modified the terms of the REC despite the provision in the REC that it could only be modified in writing.

---

[38] *Cheng v. Rabey*, 2023-NMCA-013, ¶ 21, 525 P.3d 405, 410 (citing *Medina v. Sunstate Realty, Inc.*, 1995-NMSC-002, ¶ 13, 119 N.M. 136, 138-39, 889 P.2d 171, 173-74 (holding that district court erred by excluding evidence of oral modification to a written contract specifying that all changes must be in writing)); *accord Cent. Mkt., Ltd. v. Multi-Concept Hospitality, LLC*, 2022-NMCA-021, ¶ 32, 508 P.3d 924, 934 (providing that conduct could be used to show contract was modified, despite provision requiring modifications to be in writing). *See also N.M. Life Rescue, LLC v. Bus. Aircraft Leasing, Inc.*, No. CV 05-937, 2006 WL 8444469, at *2 (D.N.M. Feb. 14, 2006) ("Under New Mexico law, oral modifications to a written contract are permissible under certain circumstances even where, as here, the contract specifies that modifications must be in writing."); *Powers v. Miller*, 1999-NMCA-080, ¶ 8, 127 N.M. 496, 498, 984 P.2d 177, 179 ("A written contract may be modified by a subsequent oral agreement, even though the written contract requires that modifications be in writing."); *Valley Bank of Com. v. Hilburn*, 2005-NMCA-004, ¶ 23, 136 N.M. 741, 747, 105 P.3d 294, 300 ("[O]ral modifications to a written contract are permissible under certain circumstances even when the contract specifies that modifications must be in writing.").

[39] *See N.M. Life Rescue*, 2006 WL 8444469, at *2.

The Court further considers whether the Statute of Frauds requires that any modification of the REC be in writing. Generally, a contract for the sale of real estate and a contract for terms one year or longer are subject to the Statute of Frauds, meaning that the contract must be in writing to be enforceable. Restatement (Second) of Contracts § 110 (1981). The Statute of Frauds also applies to modifications of contracts. *Id.* at § 150. However, a well-recognized exception to the Statute of Frauds is an oral modification or a modification by course of performance coupled with detrimental reliance.[40] By continuing to pay the Mortgage Loan directly for many years instead of making the payments to Sunwest Escrow, the McCunes detrimentally relied on the Sister-in Law's acceptance of or acquiescence to payments under the REC being made in that manner. Such modification of the REC therefore is not subject to the Statute of Frauds.

Finally, the Personal Representative argues that acceptance of the post-rejection payments to the Mortgage Lender cannot constitute waiver of the rejection breach because the REC provides that acceptance of payments does not waive any other default under the REC. However, the REC provides that "[a]cceptance by *Escrow Agent* of any payment tendered shall not be deemed a waiver by Seller . . . of any other default." ¶ 5(c) (emphasis added). The payments at issue were made to the Mortgage Lender, not Sunwest Escrow, and therefore ¶ 5(c) does not apply to prevent waiver of the rejection breach.

For the reasons set forth above in this section, the Court concludes that if the REC is not an executory contract governed by § 365(d)(1), there was no rejection of the REC, no breach, no

---

[40] *In re Tariff Res., Inc.*, 83 B.R. 176, 177 (Bankr. D.D.C. 1988); *accord Medina v. Sunstate Realty, Inc.*, 1995-NMSC-002, ¶ 14, 119 N.M. at 139, 889 P.2d at 174 (citing Restatement (Second) of Contracts § 150 (1979) for the proposition that an "oral modification to written agreement may be enforced despite the Statute of Frauds if one party changes position in reliance on oral agreement").

termination, and the REC is still in effect. On the other hand, if the REC is an executory contract governed by § 365(d)(1), the rejection breach has been waived, the REC has not been terminated, and the REC is still in effect.

      3.    *The McCunes' interest in the Property under the REC is property of the estate.*

Under New Mexico law, the buyer of real property under a real estate contract acquires an equitable interest in the property and is treated as the owner of the property with equitable title while the real estate contract is in place, while the seller maintains bare legal title.[41] The Personal Representative argues that the McCunes' equitable title to the Property under the REC is not property of the estate. After analyzing the ways in which property can leave the bankruptcy estate, the Court determines that none of them apply to the McCunes' interest in the Property under the REC and it is still property of the estate.

The Personal Representative asserts that the REC has been terminated by its rejection pursuant to § 365(d)(1) so that either it no longer is property of the estate or never became property of the estate. The Personal Representative's reasoning that the REC never became property of the estate is that under § 365(g)(1) the rejection constituted a breach of the REC that occurred immediately before the bankruptcy case was commenced and, therefore, its termination occurred prepetition. For the reasons set forth above, the Court has already concluded that the REC did not terminate upon rejection.

The Court also considers whether there is any other basis by which the McCunes' interest in the Property under the REC could have left the bankruptcy estate, such as (1) abandonment, (2) sale or other transfer by the Chapter 7 Trustee, (3) exercise of creditor remedies after stay

---

[41] *See State v. Earp*, 2014-NMCA-059, ¶ 6, 326 P.3d 491, 493 ("It has long been established by New Mexico courts that, under a real estate contract, a purchaser acquires an equitable interest in the property and is treated as the owner of the land.").

relief, or (4) automatic removal from property of the estate by operation of a statutory provision like § 365(p)(1). The Court examines each of these possibilities and determines that none of them apply to the McCunes' interest in the Property.

With respect to abandonment, property of the estate may be abandoned pursuant to § 554. Under § 554(a), after notice and a hearing, the trustee is permitted to abandon property of the estate that is "burdensome to the estate or that is of inconsequential value and benefit to the estate." Similarly, on request of a party in interest and after notice and a hearing, the court may order abandonment of property that is burdensome or of inconsequential value and benefit. § 554(b). Finally, unless the court orders otherwise, property listed on a debtor's schedules that is not otherwise administered at the time of case closing is abandoned to the debtor upon closing. § 554(c). In this case, the trustee has not abandoned the McCunes' interest in the Property under § 554(a),[42] the court has not ordered abandonment under § 554(b), and the case has not yet been closed, *see* § 554(c). Further, rejection of the REC under § 365(d)(1) does not satisfy § 554(a), (b), or (c), so there has been no abandonment of the estate's interest in the McCunes' interest in the Property.

With respect to sale or other transfer by the Chapter 7 Trustee, the Chapter 7 Trustee has not sold or otherwise transferred the McCunes' interest in the Property, nor is there any motion to approve a sale or other transfer pending. The McCunes' interest in the Property therefore has not left the bankruptcy estate by any sale or transfer by the Chapter 7 Trustee.

With respect to exercise of creditor remedies after stay relief (such as foreclosure sale or forfeiture), no creditor has filed a motion for relief from stay to pursue remedies against the

---

[42] Although the Chapter 7 Trustee filed *Chapter 7 Trustee's Report of No Distribution* (Doc. 195), which reports assets abandoned, the report does not effectuate abandonment. Section 554(a) permits the Chapter 7 Trustee to abandon assets "after notice and a hearing," and the report does not satisfy this requirement.

Property and no stay relief has been granted. Therefore, the McCunes' interest in the Property has not left the bankruptcy estate by exercise of creditor remedies after stay relief.

Finally, with respect to automatic removal from property of the estate by operation of a statutory provision, § 365(p)(1) provides that "[i]f a lease of personal property is rejected or not timely assumed by the trustee . . . the leased property is no longer property of the estate[.]" Section 365(p)(1) does not apply in this instance because it only covers leases of personal property, whereas the REC, if governed by § 365, (1) is an executory contract not a lease and (2) regards residential real property not personal property. There is no provision in the Bankruptcy Code that rejection or deemed rejection of an executory contract regarding residential real property removes the subject property from the estate. Therefore, the McCunes' interest in the Property has not left the bankruptcy estate by automatic removal.

The Court is unaware of any other mechanism by which the McCunes' interest in the Property could have left the bankruptcy estate, and thus concludes that such interest is still part of the bankruptcy estate.

4.   *Conclusion*[43]

For the reasons set forth above, the Court concludes that, regardless of whether the REC is governed by § 365, the REC is still in effect and the estate's interest in the McCunes' interest in the Property is property of the estate. The Court will enter a separate order reflecting this ruling.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: April 5, 2024

---

[43] All additional arguments have been considered and rejected.

COPY TO:

<u>Debtors</u>
Chuck McCune
2139 Don Andres Pl SW
Albuquerque, NM 87105

Chuthamard McCune
2139 Don Andres Pl SW
Albuquerque, NM 87105

<u>Creditor</u>
Robert L. Pidcock, as Personal Representative
of the Estate of Thomas W. Kuehn
501 Wyoming Blvd. SE
Albuquerque, NM 87123